**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Applicant,**

v.

**FIRST ALABAMA BANK OF BIRMINGHAM, Respondent.**

No. CA74–H–575–S.

United States District Court,
N. D. Alabama, S. D.

Dec. 2, 1977.

Abner W. Sibal, Gen. Counsel, William L. Robinson, Associate Gen. Counsel, EEOC, Washington, D. C., W. L. Williams, Jr., Donald L. Hollowell, Alfonso McGhee, EEOC Atlanta Regional Litigation Center, Atlanta, Ga., James E. Nicholson, Jr., EEOC, Birmingham, Ala., for applicant.

Henry E. Simpson, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANCOCK, District Judge.

This cause came on for trial before the court, without the intervention of a jury, on September 15–16, 1977, and is now submitted for judgment on the pleadings and the proof. The court proceeds to enter its findings of fact and conclusions of law.

On February 19, 1971, Sharon Conner (subsequently married and herein referred to as Sharon Conner Williams) filed a charge with the Equal Employment Opportunity Commission ("EEOC") primarily based upon alleged racial discrimination in her discharge from Exchange Security Bank (subsequently renamed First Alabama Bank of Birmingham and herein referred to as the "Bank"). She was a probationary employee of the Bank, working in its mail room, and among other duties she was charged with the responsibility of mailing the annual report of the Bank to its stockholders. Shortly prior to her discharge, she had erroneously mailed the 1970 annual report without affixing appropriate postage thereto, causing many of the reports to be received by shareholders with postage due charges and causing many others to be returned to the Bank undelivered. As soon as this error was discovered and attributed to her, she was discharged from her employment. The charge filed by her with EEOC asserts broader allegations of racial discrimination than simply racial motivation in and about her discharge. Evidence received during the trial supports a conclusion by the court that it was the practice of the Birmingham District Office of EEOC, at the time her charge was filed and for a number of years thereafter, to encourage a charging party to make broad allegations of discrimination far in excess of those which might affect the charging party in order that an all-encompassing investigation (and when litigation authority was given EEOC, broad litigation) could be pursued by EEOC.[1] Indeed, evidence suggests that the Birmingham District Office of EEOC has been severely criticized by higher EEOC officials and others for this practice during that period of time.

The February 19, 1971 charge was referred to Clifton Barnett, an investigator in the Birmingham District Office, and nothing further is reflected in the file of EEOC with regard to this charge until fourteen months later when, in April of 1972, routine letters were written to the Bank advising the Bank that a charge had been filed. The Bank was not advised of the identity of the charging party and thus could not begin at that time to collect data it might need in connection with the charge. The next matter in the file of EEOC pertaining to the charge is an acknowledgement by the Bank of its receiving a copy of the charge on August 8, 1972, which copy was delivered in connection with an August 8, 1972 conference between the EEOC investigator Clifton Barnett, Bank officials and an attorney for the Bank, which conference will be discussed in more detail shortly. At this conference, for the first time, the Bank was advised of the identity of the charging party and the nature of the charges against it. Thus it took 18 months from the time the charge was filed for EEOC to provide the Bank with information sufficient to permit the Bank to investigate the matter, talk to its own people, and collect data so that it

1. Perhaps this practice was an outgrowth of what EEOC's Supervisor of Investigation testified was the selection of a case as a "litigation vehicle" *prior* to investigation, a practice which clearly would not appear to aid reconciliation which this court perceives Congress intended to be at the heart of the creation of EEOC. See *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, at 367, 97 S.Ct. 2447, at 2455, 53 L.Ed.2d 402, at 412 (1977).

could participate with the EEOC in an investigation and, if necessary, begin to defend itself as to the charges.

Before discussing the August, 8, 1972 conference, it is important to examine prior *personal* transactions between the EEOC investigator, Clifton Barnett, and Bank officials and its attorneys. In October of 1971 Clifton Barnett, a former employee of Eastern Airlines who was then employed by EEOC, filed in the United States District Court for the Northern District of Alabama (Civil Action 71–897–S) on behalf of himself and others similarly situated, an action under Title VII charging racial discrimination by Eastern Airlines. The case was strenuously opposed by Eastern Airlines and was disposed of by the court on February 4, 1972, on summary judgment in favor of Eastern Airlines. Eastern Airlines won the case attacking Mr. Barnett personally, establishing that Barnett was a chronic alcoholic who had been hospitalized on several occasions for psychiatric care and analysis. Moreover, during discovery in that case Mr. Barnett in effect admitted that his claim was baseless. It is clear that the treatment he received from counsel for Eastern Airlines before the trial court was sufficient to cause Mr. Barnett to be bitter and vindictive. But that was not the end of the matter. Mr. Barnett appealed the case to the United States Court of Appeals for the Fifth Circuit which affirmed the lower court's ruling. And in August of 1972, after such affirmance, Eastern Airlines sought attorneys' fees from Mr. Barnett. Mr. James R. Moncus, Jr. represented Mr. Barnett with regard to the matter of attorneys' fees, although different counsel had represented him in the underlying action. Mr. Moncus, as will hereafter be shown in more detail, was to hold the position of District Counsel for EEOC in Birmingham and thus was the person who would normally have substantial input in the decision to proceed with court enforcement of a subpoena. Moreover, Mr. Moncus was actually working with EEOC on a parttime basis at the time he represented Mr. Barnett privately in the matter of attorneys' fees claimed by Eastern Airlines. The court in

April of 1973 awarded Eastern Airlines attorneys' fees in the amount of $1,000 and counsel for Eastern Airlines pursued collection vigorously, including garnishment, attachment, proceedings for discovery of assets and the like. There is substantial relevance of the foregoing to the issues before the court in this action because of the connection between counsel for Eastern Airlines and the Bank. Mr. James A. Simpson of the law firm of Lange, Simpson, Robinson & Somerville in Birmingham was lead counsel for Eastern Airlines and was also a co-founder of the Bank, a principal stockholder therein, a director thereof and for all practical purposes, the alter ego in the community of the Bank. His son, Henry E. Simpson, who is counsel for the Bank herein, is also a member of that firm and since at least 1971 has also been a director of the Bank. The building which housed the Bank in 1971–72 contained nothing but banking operations except for space allocated to the law firm of Lange, Simpson, Robinson & Somerville. This further identified the Bank with the law firm of Lange, Simpson, Robinson & Somerville and vice versa. The bitterness with which the Eastern Airlines litigation was pursued and the obvious hard feelings that Mr. Barnett had for the Bank's attorneys representing Eastern Airlines is clear. The court must assume that Barnett's supervisor did not know of this on-going personal bitter encounter of Mr. Barnett with the alter ego of the Bank when the matter was referred to Mr. Barnett for investigation, for surely the matter would not have been referred by any responsible official of EEOC to an investigator who might have such a conflict of interest. Quite clearly Mr. Barnett should have recused himself from investigating the matter.

As noted earlier, the original charge of Sharon Conner Williams was filed on February 19, 1971, and the next matter in the EEOC file with regard to the charge is an initial effort by Mr. Barnett to pursue investigation fourteen months later, in April of 1972, a short time after Barnett had lost his personal suit against Eastern Airlines in

the district court. Nothing other than routine letters are in the EEOC file even at that point in time until August 8, 1972, which was immediately after Mr. Barnett had lost his appeal and after the substantial effort to recover attorneys' fees from Barnett had begun. It was on August 8, 1972, that Mr. Barnett had a meeting with an employee of the Bank and Mr. Henry Simpson, a director of the Bank, and, as stated earlier, the son of the Bank's alter ego, James A. Simpson. At the August 8, 1972 meeting Mr. Barnett was given the personnel file of the charging party, Sharon Conner Williams, but he refused to review it. Rather he made broad demands upon the Bank for production of employment data on all employees. When these demands were not met, Mr. Barnett left and made an immediate request of his superiors for the issuance of a subpoena. The Bank was not aware of this request until the December 15, 1972 subpoena which is the subject of this action was issued.

It is significant to note here that EEOC was first given the authority on March 24, 1972, to utilize administrative subpoenas in connection with its investigations. But the District Office of EEOC in Birmingham had never utilized that authority until the instant case when, according to Mr. Barnett's memorandum of the August 8, 1972 meeting with the Bank employee and attorney, Mr. Barnett recommended that such a subpoena be utilized. On the recommendation of Mr. Barnett, subject subpoena was issued on December 15, 1972. It was issued by the Director of the Commission's Birmingham office. The scope of the subpoena is indeed breathtaking in view of the apparent limited nature of the initial charge of Sharon Conner Williams, particularly in view of the offer of the Bank in August of 1972 to provide, and indeed its providing the entire personnel file of Sharon Conner Williams and its willingness to answer any inquiries

concerning her treatment while an employee. On December 22, 1972, respondent, pursuant to EEOC regulations, petitioned the Commission's Director of Compliance to revoke, quash or modify the subpoena. And on January 15, 1973, the Director of Compliance denied the petition. On February 12, 1973, respondent notified the Director of the Birmingham District Office of EEOC that respondent declined to comply with the subpoena. This the respondent had a right to do. Shortly thereafter an application was prepared for filing in this court seeking court enforcement of the subpoena, but it was *seventeen* months before that application was actually filed in this court on June 14, 1974. It is therefore appropriate to review events occurring during that seventeen month period of time.

The application for court enforcement of the subpoena was prepared in Birmingham in February of 1973, and it was the duty of the Director of the Commission's Birmingham office to transmit that application to the Washington or Atlanta Office of Counsel for EEOC for enforcement. Mr. Clarence Bell was the Director of the Birmingham District office at all times material hereto but he did not cause the application to be transmitted until after March of 1974 and perhaps around June 10, 1974. At the time that Mr. Bell[2] must have made his decision to place the application in the hands of counsel for EEOC for court enforcement, Mr. Moncus was District Counsel in the Birmingham office and was the one who would have advised Mr. Bell with regard to court enforcement of subpoenas and other legal matters. Mr. Moncus, as stated earlier, was also serving as counsel for investigator Barnett in a private matter unrelated to his work with EEOC. Equally as significant to the court is the statement by counsel for applicant that it was during this time frame, i. e., late spring of 1974,

2. Counsel for respondent propounded extensive interrogatories to applicant seeking explanations for the delays and other matters clearly relevant to the issues before the court. Clarence Bell, though still an employee with EEOC, was not even consulted by EEOC in connection with the preparation of the answers to those interrogatories, and the court does not have available before it what Mr. Bell might be able to explain to the court were he present as a witness or had his knowledge been included, as the court feels that it should have been included, in full and complete answers to the interrogatories.

that EEOC was encountering substantial opposition in Congress to its budget requests at committee hearings and consequently EEOC as a matter of policy directed the immediate filing in court of any lawsuits which could be filed in an effort to justify, by way of numbers of pending cases, its requests for congressional appropriations. The court cannot help but conclude that the filing of the enforcement proceeding with regard to this subpoena was motivated, at least in part, by EEOC's desire to file in court large numbers of cases to support its budget requests then pending before Congress.

■ The court does not need to review the congressional history of the legislation giving EEOC subpoena powers to conclude that such subpoena powers were not intended to provide to EEOC employees a vehicle to pursue their own personal vendettas. Harassment of an employer for the personal satisfaction of a government official is unthinkable. The court here concludes that the initial decision of EEOC investigator Barnett in August of 1972 to request the issuance of subject subpoena was based totally on personal considerations, unrelated to the charges under investigation and was pursued by him only as a vehicle to strike back at the Bank's attorney. The court also concludes that it was even improper for Mr. Barnett to serve the role of investigator because of the personal conflicts involved. Moreover, the participation of Mr. Barnett's private attorney in the belated application to this court for enforcement further compels this court to conclude that both the issuance of the subpoena and the application for court enforcement are for an improper purpose, either merely to harass the attorneys for the Bank or to put pressure on them to settle the Eastern Airlines legal fee issue involving both Barnett and Moncus. This so reflects on the good faith of the purported investigation as to mandate a rejection of the application for enforcement. As stated in *United States v. Pow-*

*ell*, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964):

"Nor does our reading of the statutes mean that under no circumstances may the court inquire into the underlying reasons for the examinations. It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. (cite) Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation."

■ There is another, and equally compelling reason why the application for enforcement must be denied. The respondent has clearly sustained substantial prejudice by the unwarranted, and unsatisfactorily explained [3] delay of nearly two years in pursuing court enforcement of the subpoena. It must be concluded that even if the delay was unintentional, the delay was clearly the result of "slothfulness," "lethargy" or "inertia" and the belated decision to enforce the subpoena was the result of "caprice." The court's finding of "caprice" is not to be construed as a finding that the decision to enforce the subpoena was without a motive, for as held earlier there was substantial motive involved. The finding of "caprice" simply means that the improper personal motive here found by the court is so unlawful as to be the equivalent of no motive at all attributable to the agency. But, as held in *EEOC v. Exchange Security Bank*, 529 F.2d 1214 (5th Cir. 1976), there must be more than mere "slothfulness, lethargy, inertia or caprice," there must be a showing of prejudice as a result thereof. Respondent has here made such a showing. Forty months elapsed from the time the underlying charge was filed to the time the application for court enforcement of the subpoena was filed; and seventeen months elapsed from the time the Bank lawfully

---

3. The only explanations offered by EEOC were the internal personal conflicts within that agency and the lack of the ability of that agency to

organize itself to utilize the powers given to it on March 24, 1972.

advised EEOC that it would not comply with the subpoena to the time the application for enforcement of the subpoena was filed. EEOC's Supervisor of Investigation, Earnest Pugh, acknowledged that this delay caused prejudice to the Bank. Indeed, he correctly found prejudice to all parties by such a delay. There has been a major change in personnel at the Bank that now prevents it from conducting meaningful reconciliation conferences and, if the need arose, from defending a broad scale charge of discrimination. Methods of recordkeeping highly relevant to issues embraced in the initial charge and which might be pursued by EEOC have been changed, and the last of those familiar with the old recordkeeping system left the Bank several years ago. Sharon Conner Williams' supervisor left the Bank's employment in January, 1973, and efforts to locate him have been unsuccessful; indeed there is no person employed by the Bank in the mailing room familiar with the facts underlying the original February, 1971 charge of Sharon Conner Williams. Relying on the reasonable assumption that this matter was a closed matter, the Bank during the seventeen month period immediately prior to the filing of this enforcement proceeding has taken and refrained from taking action which will clearly and materially impair its ability to respond to the underlying charge. The obvious prejudice to the Bank that EEOC's Director of Compliance found was undoubtedly the reason EEOC initiated its "charging party contact program"—a program designed to dismiss all charges over *two* years old where the charging party cannot be contacted. In this connection it should be noted that there has been no contact between EEOC and Sharon Conner Williams for over *five* years. Indeed, the Supervisor of Investigation testified that he had not even examined her file during the past several years.

The statute pursuant to which applicant is here seeking enforcement of its subpoena contemplates that this court will exercise its discretion in deciding whether enforcement should be allowed. 42 U.S.C. § 2000e–9, incorporating 29 U.S.C. § 161.

Also see, *Goodyear Tire & Rubber Company v. N.L.R.B.*, 122 F.2d 450 (6th Cir. 1941). The court concludes that it would be a gross abuse of its discretion to enforce the subpoena and accordingly the application for enforcement will be denied. An appropriate final order will be entered. The entry of such order will represent this court's effort "to locate a just result in light of the circumstances peculiar to the case." See *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, at 373, 97 S.Ct. 2447, at 2458, 53 L.Ed.2d 402, at 422 (1977).